

Nathan R. Hoeschen
I.M. Pei Building
1105 North Market St., 12th Floor
Wilmington, DE 19801
(302) 298-0700
(302) 298-0709 – Direct
nhoeschen@shawkeller.com

July 11, 2019

**BY CM/ECF & HAND DELIVERY**
The Honorable Richard G. Andrews
United States District Court for the District of Delaware
844 N. King Street
Wilmington, DE 19801

    Re:   *IBSA Institut Biochimique, S.A. et al v. Teva Pharmaceuticals USA, Inc.*
            C.A. No. 18-555-RGA

Dear Judge Andrews:

    We write on behalf of defendant Teva Pharmaceuticals USA, Inc. ("Teva") in the above-referenced action. As discussed with Your Honor at the June 27 claim-construction hearing, the depositions of each side's expert witness on claim construction could not be taken until after claim-construction briefing had been completed. We write to provide the Court with additional information from those two depositions relevant to the construction of the disputed claim term "half-liquid." Additionally, per your honor's request, we include a brief explanation of why resolving the parties' claim construction dispute over the "uniform soft-gel matrix" term is not merely an advisory opinion.

### I.   *One of Ordinary Skill in the Art Would Find the Claim Term "Half-Liquid" Indefinite*

####     A.  *Deposition of Plaintiffs' Expert, Dr. Chyall*

    Dr. Chyall's testimony that one of skill in the art would understand the term "half-liquid" to mean semiliquid is based largely on his interpretation of an Italian-language priority document and several general-purpose dictionaries, especially one from the late 1800's defining the term semiliquid as half-liquid or semi-fluid. All of his opinions regarding indefiniteness were based on the meaning of semiliquid, rather than half-liquid, which he admits is not a term of art. Ex. A, Chyall Tr. at 160:18-161:11, 164:11-165:12.

    Yet, when asked at his deposition about his definition of semiliquid, Dr. Chyall stated that the terms half-liquid, semiliquid, and semi-fluid were *not* actually synonymous in the context of pharmaceutical formulations, nor are these terms synonymous with semi-solid. Chyall Tr. at 91:10-92:8. He could not specify the precise relationships among these words. *Id.* Although Dr. Chyall defined the term semiliquid to be a viscous liquid, he did not know what viscosities were associated with a semiliquid as opposed to a liquid or solid. *Id.* at 43:10-44:3.

    In addition to not being able to explain the boundaries of the very terms on which he was offering opinions, Dr. Chyall's opinion is inconsistent with the prosecution history of the '390 patent, as according to Dr. Chyall, Plaintiffs' proposed construction of half-liquid as a viscous liquid would read on the very macromolecular gel lattices and slurries that were distinguished

during prosecution. Chyall Tr. at 99:4-18; 123:16-124:4; 129:18-130:2. When pressed, Dr. Chyall admitted that he could not articulate a difference between the half-liquid formulations claimed and those expressly disclaimed, could not identify the relevant temperatures for determining whether something was half-liquid, and could not identify the relevant viscosities, or even the type of test one might do to determine that information. *Id.* at 87:6-88:10. Put simply, Dr. Chyall was unable to explain how one of skill in the art would be able to tell whether a given substance was a half-liquid according to the '390 patent. *Id.* at 50:7-14; 74:21-75:11.

### B. Deposition of Teva's Expert Dr. Mansoor Khan

At his deposition, Dr. Kahn testified that in all his years of reviewing posters presented at meetings of the Association of Pharmaceutical Scientists, the biggest professional body in the field, he has never once seen the term "half-liquid" used, nor has he ever seen the term "half-liquid" used on the label of an FDA-approved pharmaceutical product, nor has he seen the term "half-liquid" used in scientific literature. Ex. B., Khan Tr. 50:18-51. And Dr. Kahn should know, having served as a director in the FDA's Center for Drug Evaluation and Research from 2004 until 2015, where he researched and provided guidance to reviewers and FDA inspectors with regard to pharmaceutical formulations. Khan Tr. 10:16-11:20. Dr. Kahn also testified that he had not ever used the term "half-liquid" in any of his over 300 published papers related to formulations. *Id*. at 43:2-3. In addition to his past experience, Dr. Khan also performed a search of scientific literature for the term "half-liquid" but did not find the term being used to describe any pharmaceutical product. *Id.* at 36:2-22.

Based on his extensive experience in the field and his literature search, Dr. Kahn's opinion is that the term "half-liquid" does not have a definite meaning to persons of skill in the art pertinent to the patent in suit: "My opinion is that half-liquid term – I don't know what it means – I don't know the boundaries.[1] I don't know the scope." Khan Tr. 55:16-20.

Plaintiffs, and their expert Dr. Chyall, argued that the fact that an Italian priority document uses the Italian word "semiliquido" implies that the term "half-liquid" must mean "semiliquid." This is simply incorrect. Dr. Khan testified that he does not speak Italian, *id.* at 60:6-7, and he did not consider the Italian priority document in forming his opinion about the indefiniteness of the word "half-liquid," *id.* at 57:17-19. He explained that both he and a POSA would look to the scientific literature to determine the meaning of half-liquid, *id.* at 42:10-21, not to a foreign language priority document that was translated at some later point in time. Although Dr. Khan is familiar with the term "semiliquid," his opinion is that "half-liquid" and "semiliquid" are different terms. *Id.* at 55:23-56:7.

Furthermore, even if a POSA were to look to the Italian priority document, see that it said "semiliquido," and inform their understanding of the term "half-liquid" with the guess that it is related to "semiliquid," the POSA would not understand "half-liquid" to mean a viscous liquid as Plaintiffs and Dr. Chyall argue – ***because that is not what semiliquid refers to***. Dr. Khan explained that the terms semiliquid and semisolid, in the context of pharmaceuticals, are terms

---

[1] The original transcript states "I don't know the bond raise (phonetic)." The version reproduced here reflects the correction in Dr. Khan's errata sheet.

that are used to refer to materials that have a tendency to change phase when subjected to processing. Such a material is said to be a semiliquid when it flows during processing but a semisolid when it is put into the final dosage form and becomes solid. Indeed, Dr. Khan confirmed in response to questions by Plaintiffs' counsel that Remington's Pharmaceutical Science uses the term "semiliquid" only when referring to material that is in a liquid phase during processing, not in a stable product. *Id.* at 18:25-19:3; *see also id.*at 23:21-24:25.

Dr. Khan further explained that the terms "semiliquid" and "semisolid" have well understood meanings, analogizing the difference between the terms to baked goods coming out of the oven:

> [Y]ou know, you buy something, you go to a bakery, the product is still hot, right? When you open, you buy fresh, right? But you bring it home, after some time, then it's not that hot anymore.
> So it's possible, when they're freshly prepared, they're still coming out from the machine, the rotary machine – you – you mentioned this machine, so when it's coming out, it's still possible that it is warm and still liquid in that temperature. So it could be semiliquid, and that's it.
> But nobody would mention it's a semiliquid, because it won't stay like that. That's not permanent[2] – that's why these approved product labels, nobody will write semiliquid there.

*Id.* at 25:7-21. Dr. Khan later gave a more technical explanation of the concept of semiliquid, which he said is a term that makes sense only when used in reference to a corresponding solid, and the material is in some state of transition between that liquid and that solid. *Id.* at 81:2-84:22. He described a semiliquid as a non-Newtonian liquid, as contrasted with classical Newtonian liquids, such as water or glycerol, which to do not transition to a solid phase at room temperature: "Only when they transition, then you use semisolid or semiliquid. If they don't transition, you don't use the term." *Id.* at 82:1-4; 82:23-83:3. Dr. Khan thus does not agree that semiliquid simply refers to a viscous liquid, because viscous Newtonian liquids are not semiliquids. *Id.* at 81:2-84:22

Given the state of the record, a person of ordinary skill in the art at the time of the application for the '390 patent would not have been able to discern with reasonable certainty the boundaries of the claims that refer to the claimed products as involving a half-liquid. Accordingly, the Court should declare the term half-liquid to be indefinite.

## II. *Resolving the Scope of a Uniform Softgel Matrix is Not An Advisory Opinion*

The Court further requested clarification as to the purpose for which Teva seeks a claim construction ruling on the term "uniform soft-gel matrix" when it appears that Plaintiffs have not accused Teva's ANDA product of being a uniform softgel matrix. The reason that this term

---

[2] The original transcript states "(inaudible)." The version reproduced here reflects the correct in Dr. Khan's errata sheet.

3

nonetheless needs to be understood comes from the unconventional way in which Claim 1 is drafted. Claim 1 recites two mutually exclusive, alternative embodiments:

> 1. A pharmaceutical composition comprising thyroid hormones or their sodium salts in the form of either:
>
> a) a soft elastic capsule consisting of a shell of gelatin material containing a liquid or half-liquid inner phase comprising said thyroid hormones or their salts in a range between 0.001 and 1% by weight of said inner phase, dissolved in gelatin and/or glycerol, and optionally ethanol, said liquid or half-liquid inner phase being in direct contact with said shell without any interposed layers, or
>
> b) a swallowable uniform soft-gel matrix comprising glycerol and said thyroid hormones or their salts in a range between 0.001 and 1% by weight of said matrix.

Plaintiffs' contentions accuse Teva's ANDA product of infringing alternative (a), although Plaintiffs' counsel admitted during the hearing that Plaintiffs would amend their constructions to assert alternative (b) if certain of Teva's proposed claim constructions are adopted. Regardless, Teva cannot know whether it infringes alternative (a) unless the scope of mutually exclusive alternative (b) is clear.

      For example, Plaintiffs argue that the term "half-liquid" is broad enough to include a gel. Under that interpretation, there appears to be no difference between a soft elastic capsule containing a gel inner phase under alternative (a) and a uniform soft gel matrix with an outer coating simplifying ingestion under alternative (b) and claim 7. But the disjunctive structure of claim 1 indicates that there must be a difference. Accordingly, understanding what claim 1(b) covers, and therefore what claim 1(a) excludes, is essential for understanding whether and how claim 1(a) may be infringed or invalidated.

      Teva proposes that a uniform softgel matrix must have no capsule shell, because that is how the specification and the prosecution history distinguish a uniform (i.e., single-phase) softgel matrix from a soft elastic capsule with gel inner fill. What a uniform softgel matrix *is* thus informs what a soft elastic capsule is *not*. Resolving the full scope of claim 1, including the scope of mutually exclusive clauses (a) and (b), is not merely an advisory opinion. It will bear on the question of whether Teva's ANDA product practices claim limitation 1(a) and whether the prior art that Teva has identified is pertinent to limitation 1(a), which is currently being asserted in the litigation.

      Respectfully submitted,

      */s/ Nathan R. Hoeschen*

      Nathan R. Hoeschen (No. 6232)

cc:    Clerk of the Court (by hand delivery)
         All counsel of record (by e-mail)