# Morris, Nichols, Arsht & Tunnell LLP

1201 North Market Street
P.O. Box 1347
Wilmington, Delaware  19899-1347

(302) 658-9200
(302) 658-3989 FAX

**Jack B. Blumenfeld**
(302) 351-9291
(302) 425-3012 FAX
jblumenfeld@mnat.com

July 11, 2019

The Honorable Richard G. Andrews   *VIA ELECTRONIC FILING*
United States District Court
  For the District of Delaware
844 North King Street
Wilmington, DE  19801

   Re:   *IBSA Institut Biochimique, S.A., et al. v. Teva Pharmaceuticals USA, Inc.*
         C.A. No. 18-555 (RGA)

Dear Judge Andrews:

   Plaintiffs submit this letter brief regarding claim construction of the term "half-liquid" pursuant to the Court's instructions at the conclusion of the June 27, 2019 *Markman* hearing. Plaintiffs address below the declarants' deposition testimony and the Court's questions regarding the relevance of foreign language priority applications.

**I.   Dr. Chyall Explained that the '390 Patent's Specification Supports Plaintiffs' Construction of "Half-Liquid"**

   Under Plaintiffs' construction, "half-liquid" substances have "a thick consistency between solid and liquid." As Plaintiffs' expert Dr. Chyall testified, this construction is clear from the '390 patent's specification alone. Deposition Transcript of Leonard Chyall, dated May 21, 2019, D.I. 91 ("Chyall Tr.") at 53:21-54:3 ("[W]ithout the dictionary, I understood what half-liquid meant in the context of the '390 Patent."); 110:8-14 ("I didn't even really need the prosecution history . . . It's pretty clear what a half-liquid means. So the Italian application is just confirmatory of what I already knew."). According to Dr. Chyall, "I just read the specification, read the claims, and based on that exercise, I understood what half-liquid meant." *Id.* at 107:2-5.

   Dr. Chyall reached this understanding based on "half-liquids that are called out [in the specification, which] are clearly those materials that would be viewed as materials having a thick consistency." Chyall Tr. at 111:11-112:4.  These half-liquids are "called out" in a "list of chemicals" that the patent instructs persons of ordinary skill to use to "modify the viscosity" of the capsules. *Id.*; *see also id.* at 144:21-145:8.  According to Dr. Chyall, "a skilled person would appreciate that some of these are viscous liquids, [having] thick consistencies between a liquid and [a] solid." *Id.* at

111:19-112:4. He identified examples of half-liquids used in the patent as vehicles for the active ingredient, such as Tween, sorbitans, trioleates, and polyethylene glycol 400, some of which are used in the patent's examples. *Id.* at 142:4-144:3. He also explained that persons of skill know that those substances are "materials with thick consistencies" that are "clearly half-liquids," even if the patent does not "come out and say [it] explicitly." *Id.*

Plaintiffs' construction of "half-liquid" as "having a thick consistency between solid and liquid" matches this intrinsic evidence, which Teva and its expert Dr. Khan did not address.

**II.  The Italian Priority Application Is Intrinsic Evidence that Supports Plaintiffs' Proposed Construction**

As Dr. Chyall explained, the '390 patent's Italian priority application is "confirmatory" of Plaintiffs' construction of "half-liquid." Chyall Tr. at 110:8-14. The Italian application is relevant to claim construction even though it is not written in English.[1] The Federal Circuit has explained that foreign language priority applications are "intrinsic evidence" as "part of the prosecution history" and therefore "properly considered . . . as relevant objective evidence of the inventor's knowledge." *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1289-1291 (Fed. Cir. 2009). This is consistent with the function of the prosecution history as intrinsic evidence, which is to "provide[] evidence of how . . . the inventor understood the patent." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) (*en banc*). A non-English-speaking inventor's priority application, drafted in the inventor's native tongue, serves that purpose.

District courts have put this approach into practice. For example, in *Pioneer Corp. v. Samsung SDI Co.*, an accused infringer argued that a translation it had obtained of the patent-in-suit's Korean priority application supported its claim construction. No. 2:06-cv-384, 2007 WL 5688764, at *22-23 (E.D. Tex. Dec. 27, 2007). The patentee acknowledged that foreign priority applications are intrinsic evidence and "may help clarify or 'bolster'" a proposed construction, but argued that the accused infringer was "attempting to utilize an *ad hoc* translation of a priority document to rewrite the specification." *Id.* The court rejected this argument—noting that the patentee had not offered a competing translation—and credited the translation of the Korean priority application as relevant intrinsic evidence. *Id.* at *23 n.2, *25. Likewise, in *Mitsubishi Heavy Indus., Ltd. v. General Electric Co.*, the court explained that "the prosecution history consists of . . . the accompanying Japanese [priority] patent applications," and construed claims by comparing statements in the patent-in-suit to corresponding statements in the Japanese applications. No. 6:10-cv-812, 2012 WL 2594337, at *1, *3, *5 (M.D. Fla. July 5, 2012). District courts have additionally found foreign language extrinsic evidence to be informative of claim scope. *Apple, Inc. v. Motorola, Inc.*, No. 10-cv-662, 2011 WL 10004441 at *12-14 (W.D. Wis. Oct. 13, 2011) ("statements made by defendant during the Japanese prosecution are powerful extrinsic evidence regarding the scope of defendant's invention").

---

[1] During the *Markman* hearing, the Court inquired "whether either side actually ha[d] a case" deciding that foreign priority documents are intrinsic evidence. *See* Transcript of the Markman Hearing, dated June 27, 2019, D.I. 94 ("Markman Tr.") at 33:12-34:6.

In this case, the '390 patent's Italian priority application uses the term "semiliquido" where the corresponding portions of the '390 patent use "half-liquid." *See* Joint Claim Construction Appendix, D.I. 72 ("Appendix") at Ex. O, IBSATIR-00000576, -579-83, and -587 (Italian Priority Application). It is undisputed that "semiliquido" can be translated as "semi-liquid." Appendix at Ex. P, 14, 17-21, 25 (Certified Translation of Priority Application). Even without that translation, both sides' experts agreed that they readily understood "semiliquido" to mean "semi-liquid," despite not speaking Italian. Chyall Tr. at 109:10-16; Deposition Transcript of Mansoor Khan, dated May 30, 2019, D.I. 91 ("Khan Tr.") at 60:6-17, 64:19-65:3. Accordingly, the meaning of the term "semi-liquid" should inform the Court's construction of "half-liquid." As explained in Plaintiffs' portions of the parties' joint brief and in Dr. Chyall's declaration, one of skill would understand "semi-liquid" to refer to a substance with a thick consistency, in between that of a liquid and a solid—perfectly consistent with Plaintiffs' construction of "half-liquid."

Dr. Chyall testified that he found the Italian application "very telling, that half-liquid and semi-liquid are the same thing" (although he also noted that the meaning of "half-liquid" was apparent to him even without looking at the Italian application). Chyall Tr. at 109:4-9. Teva's expert Dr. Khan did not address this intrinsic evidence in his declaration, as explained further below.

**III.     Dr. Khan's Opinions Are Not Clear and Convincing Evidence of Indefiniteness**

Conclusory, unsupported assertions by experts are insufficient to prove indefiniteness by clear and convincing evidence. *E.g., Intel Corp. v. VIA Techs.*, 319 F.3d 1357, 1367 (Fed. Cir. 2003) (conclusory expert statements that the "patent did not disclose adequate structure for one skilled in the art to determine the scope of the claims" were insufficient to prove indefiniteness); *see also Belden Inc. v. Berk-Tek LLC*, 610 Fed. App'x 997, 1003 (Fed. Cir. 2015) (explaining that "the Board correctly rejected Belden's expert testimony . . . , finding that it was conclusory and not supported by a citation to the [s]pecification or an ordinary meaning").

In this case, the opinions in Dr. Khan's declaration are contained in just three short paragraphs, devoid of citation or analysis. *See* Appendix at Ex. Y, ¶¶ 18-20. First, he asserted that "half-liquid" has no known meaning, but he said nothing about any investigation he did to assess this, and he never addressed the patents that Plaintiffs and Dr. Chyall identified that use the term. *Id.* at ¶ 18. Second, he asserted that the specification is insufficient to give meaning to "half-liquid," without actually discussing the specification (or any other intrinsic evidence) in any way; he certainly did not address the portions of the specification that Dr. Chyall testified support Plaintiffs' construction. *Id.* at ¶ 19. Third, Dr. Khan asserted (without any explanation) that a skilled person would not understand "half-liquid" to mean "semi-liquid," but he never mentioned the Italian priority application, which uses the word "semiliquido" where the patent uses "half-liquid." *Id.* at ¶ 20. Dr. Khan's conclusory opinions do not constitute clear and convincing evidence of indefiniteness.

In fact, Dr. Khan's testimony on "semi-liquid" supports Plaintiffs' construction, not Teva's indefiniteness theory. First, he readily admitted that he understood that "semiliquido" means "semi-liquid." Khan Tr. at 60:6-17. Next, he admitted that "semiliquid makes some sense to me" and "I can understand semiliquid," emphasizing that "if I see semiliquid, I would immediately know semiliquid." *Id.* at 64:5-18. And he admitted that "semi-liquids" are known to be used in the art of

making soft-gel capsules. *Id.* at 18:4-19:9 (agreeing that Remington's, which is cited in the '390 patent, describes "a semiliquid going into the soft gelatin capsule . . . shell"); 26:16-19 ("I mean, I— I can understand that they're filled with material which is semiliquid . . . yeah, it is in the capsule."). He even admitted he "would have understood if they used semiliquid" in the '390 patent instead of "half-liquid." *Id.* at 56:9-17. Yet the inventors *did* use "semi-liquid" in their priority application, in all the places where the issued patent uses "half-liquid." Dr. Khan testified that he was aware of the Italian priority application, although he could not clearly state whether he had reviewed it. Khan Tr. at 56:19-57:19. In any event, Dr. Khan's decision to ignore this intrinsic evidence in his declaration renders his indefiniteness opinion not credible. *See* Appendix at Ex. Y, ¶¶ 18-20.

Moreover, Dr. Khan testified that "my understanding of semiliquid is, **there is a liquid, there is a solid, and so there is an intermediate property** between the liquid. So there's a reference for a liquid and a solid, and then **there's a consistency between**." *Id.* at 65:21-66:2 (emphasis added). That description of "semi-liquid" is a nearly perfect match for Plaintiffs' proposed construction of "half-liquid," which is "having a thick consistency between solid and liquid." Given the connection between the two terms in the intrinsic evidence, Dr. Khan's admission regarding "semi-liquid's" meaning confirms Plaintiffs' construction of "half-liquid" is correct.

Dr. Khan was defensive when asked whether the existence of references that used the term "half-liquid" established that "at least some people—presumably formulators, understood what half-liquid was." *Id.* at 42:22-24. His response was that he "formulate[s] as good as anybody else" and "won an award on formulation this Nation gives only to one person every two years . . . I got that award," but he had never heard the term "half-liquid." *Id.* at 43:1-20. Dr. Khan, however, had to concede that "some people do—did" use the term "half-liquid," *id.,* when shown the patents using the term that Plaintiffs cited. His admission shows that the term is used in the relevant field.

Dr. Khan was also defensive when questioned about his declaration's brevity, urging that he had done an exhaustive investigation but chose not to write any of it down. *Id.* at 34:14-36:1 ("I considered a lot of materials. Like I said, I considered a lot of material, but I didn't see the need to write that down here."). He claimed it was "hard for [him] to say" how much time he had spent on his declaration because he had reviewed "[j]ust about every text that you can think of in pharmaceutical science dealing with those forms," and that he also "looked at 1,000 products" in his analysis, although he cited none of this. *Id.* at 28:11-24, 43:8. Dr. Khan's vague suggestion that he reviewed over 1,000 products and "every text that you can think of," without providing any details of how he searched or what he found, falls far short of the clear and convincing evidence required for indefiniteness.

### IV. Persons of Ordinary Skill Understand the Difference Between a Half-Liquid and a Solid, and Dr. Chyall Did Not Testify Otherwise

#### A. No Mathematical Quantification Is Necessary to Understand "Half-Liquid"

Teva argued during the *Markman* hearing that "half-liquid" is indefinite because Dr. Chyall could not identify specific viscosity values or test methods that one could use to assess whether they had created a half-liquid, rather than a liquid or a solid. Markman Tr. at 52:19-24. Teva apparently believes that, unless Plaintiffs can identify a specific range of numerical values, collected using a

specific test method, to mathematically delimit the concept of a "half-liquid"—even though the intrinsic evidence does not describe any such testing or numerical values—the term is indefinite.

That is not the law. "[A] patentee need not define his invention with mathematical precision in order to comply with the definiteness requirement." *Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp, LLC*, 879 F.3d 1332, 1346 (Fed. Cir. 2018); *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017) ("'Reasonable certainty' does not require 'absolute or mathematical precision.'") (quoting *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1381 (Fed. Cir. 2015)). This is because "patentable inventions cannot always be described in terms of exact measurements, symbols and formulae." *In re Packard*, 751 F.3d 1307, 1313 (Fed. Cir. 2014) (quoting *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 258 F.2d 124, 136 (2d Cir. 1958)). As the Federal Circuit explained, "[t]he definiteness requirement[,]. . . applied to the real world of modern technology, does not contemplate in every case a verbal precision of the kind found in mathematics. . . . Rather, how much clarity is required necessarily invokes some standard of reasonable precision in the use of language in the context of the circumstances." *In re Packard*, 751 F.3d at 1313.

In the case of the '390 patent, the differences between liquids, half-liquids, and solids are clear without resort to specific numerical measurements, as Dr. Chyall explained during his deposition. First, he testified that "**liquids** are going to be free flowing. They will not have a thick consistency." Chyall Tr. at 66:5-7 (emphasis added). He gave several examples of liquids, such as methanol, ethanol, and acetone, describing them as "things that you buy in jugs and can pour out . . . readily that flow like water." *Id.* at 84:11-18.

Conversely, as Teva highlighted during the *Markman* hearing, the patent "very clearly talk[s] about . . . capsules filled with **solids**. These are powders, granules, [and] micropellets"—hard, dry substances that are self-evidently not liquid or half-liquid. Markman Tr. 64:6-10 (emphasis added); '390 patent at 7:9-20, 7:30-39. Dr. Chyall pointed out that numerical viscosity measurements—the element Teva claims is required to distinguish between half-liquids and solids—are not possible for solids, since they do not flow. Chyall Tr. at 44:14-45:1. This makes Teva's complaint about the lack of numerical precision totally irrelevant to assessing the claims' scope.

In between liquids and solids are **half-liquids**, which "have thick consistencies between a liquid and a solid;" they flow less freely than water-like liquids, but unlike solids, they will "eventually respond to gravity and will flow." Chyall Tr. at 23:22-25:19. As real-world examples, Dr. Chyall cited syrups, toothpaste, and peanut butter. *Id.* at 35:7-19; 78:7-19; 97:20-98:7. In the pharmaceutical context, the patent gives specific examples of half-liquids that can be used to modify the viscosity of pharmaceutical compositions. Dr. Chyall testified that "a skilled person would appreciate that some of these are viscous liquids, [with] thick consistencies," unlike liquids that "flow like water." *Compare id.* at 112:1-4, *with id.* at 84:11-18.

Plaintiffs' construction reflects this middle ground, tracking the intrinsic evidence and the knowledge of one of ordinary skill. The alleged lack of quantification that Teva complains of is a problem of its own making: there is **no** evidence in the record suggesting that persons of ordinary skill cannot distinguish between half-liquids and solids without resort to mathematical

The Honorable Richard G. Andrews
July 11, 2019
Page 6

quantification. The numerous uses of the term "half-liquid" in the pharmaceutical arts without any mention of a specific numerical range confirm this.[2]

        B.        *Dr. Chyall Did Not Testify that Determining "Half-Liquid's" Boundaries Is Impossible*

Teva misconstrues Dr. Chyall's testimony regarding viscosity values and test methods to suit its theory. Dr. Chyall's opinion is that one of ordinary skill can understand the term "half liquid" without reference to a specific test method or range of viscosity values; it is therefore no surprise that he was not prepared to identify such a test method or numerical range. But he never said it was *impossible* to design a test that would inform whether a given material is a half-liquid, nor did he aver that there is no range of viscosities associated with half-liquids. Rather, he simply said that he had not yet considered those issues and could not opine on them on the fly based on the incomplete questions asked of him. *E.g.*, Chyall Tr. at 89:13-90:6 ("[T]here is just not enough information concerning your question for me to provide you with a protocol to do that testing [*i.e.,* whether the inner phase is a half-liquid]. It's something that I haven't considered fully . . . ."), 149:6-11 ("With respect to coming up with a formulation that designs around the scope of the claims, I'm not sure offhand. That's sort of a tough question to answer without having considered it . . . .").

Dr. Chyall's approach was proper, since testing a substance to determine whether it is a half-liquid and therefore falls within the claims' scope relates to *infringement*, which is unquestionably a separate issue that *follows* claim construction. *E.g.*, *3M v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1570 (Fed. Cir. 1992) (infringement "requires a two step analysis—first, the language of the claim at issue must be interpreted to define its proper scope and, second, the evidence . . . must be examined to ascertain whether the claim has been infringed"). Dr. Chyall's reluctance to provide infringement proofs at this early stage does not render the claims indefinite.

**V.**        **Dr. Chyall's Testimony Regarding Prosecution Does Not Support Teva's Positions**

Teva also argues that the applicants for the '390 patent disclaimed all gels during prosecution, and Dr. Chyall admitted that Plaintiffs' construction of "half-liquid" might capture the prior art gels that applicants distinguished. Markman Tr. at 56:23-57:14. That argument is incorrect for two reasons. First, what Dr. Chyall actually said was "I'm not sure" and "[o]ffhand I don't know," when he was asked if his construction excluded "the types of gels that were distinguished during prosecution." Chyall Tr. at 147:4-21. Notably, he was not given the relevant reference or prosecution history excerpt before answering. His lack of absolute certainty as to whether those specific gels were "half-liquids" is therefore not the admission Teva suggests.

Second, the prosecution record does not establish that applicants distinguished *all* gels as not liquids or half-liquids. Instead, applicants distinguished the reference-in-question ("Miskel") because it disclosed a very specific type of composition—a "***macromolecular*** gel-lattice matrix,"

---

[2] *See* Appendix at Ex. AA (U.S. Patent No. 6,211,221 (2001)); Ex. BB (U.S. Patent No. 6,207,696 (2001)); Ex. CC (U.S. Patent No. 5,741,807 (1998)); Ex. DD (U.S. Patent No. 4,975,450 (1990)); Ex. EE (U.S. Patent No. 9,532,960 (2017)); Ex. FF (U.S. Patent No. 7,868,012 (2011)); and Ex. GG (U.S. Patent No. 6,596,719 (2003)).

which, applicants explained, "is not a solution in gelatin and/or glycerol," as the claims required. Appendix at Ex. I, IBSATIR-00000939 (emphasis in original); Appendix at Ex. L, IBSATIR-00000978. Applicants further distinguished Miskel because it concerned formulations containing a high concentration of active ingredient, and the claimed invention concerned thyroid hormones "precisely titrated at a very low therapeutical level." Appendix at Ex. L, IBSATIR-00000977. As applicants explained, the pending claims covered "an amount of active principle [sic] from at most 50 times lower than the minimum concentration of Miskel (which does not even relate to thyroid hormones) to 50,000 times lower than that minimum concentration." *Id.* at IBSATIR-00000977-978. But applicants *never* said that the term "half liquid" excludes *all* gels. It is therefore of no moment that Plaintiffs' construction might cover them—if, of course, they otherwise meet the construction's requirements.

Teva makes a similarly unavailing argument regarding slurries, claiming that Dr. Chyall could not answer whether certain slurries distinguished during prosecution met his definition of "half-liquid." Markman Tr. at 57:20-58:19. Again, Dr. Chyall was not given the relevant reference or prosecution history excerpt when asked about these specific allegedly prior art slurries. His testimony was: "[j]ust going from memory, I do indeed remember some high drug content slurry of the thyroid hormones. They were different than the invention." Chyall Tr. at 148:6-10. And he was correct: as applicants pointed out during prosecution, the slurry in question was "a suspension of a large quantity of T3/T4 (which can be as much as 85,000 times greater than the claimed invention)." Appendix at Ex. L, IBSATIR-00000977. Again, Applicants did not distinguish these prior art slurries because they were not "half-liquids," so it is immaterial whether a slurry might fall within Plaintiffs' construction of that particular claim term.

### VI. "Uniform Soft-Gel Matrix"

During the *Markman* hearing, the Court asked the parties whether it is necessary to construe the term "uniform soft-gel matrix," which appears in part (b) of claim 1. Plaintiffs' position is that the construction of that term is still a live issue both because part (b) of claim 1 is challenged in Teva's invalidity contentions, and because depending on the Court's construction of terms in part (a) of claim 1, as well as discovery to be taken in this action, Plaintiffs may pursue infringement under part (b) of claim 1.

Respectfully,

*/s/ Jack B. Blumenfeld*

Jack B. Blumenfeld (#1014)

JBB/rah

cc: Clerk of the Court (via hand delivery)
      All Counsel of Record (via electronic mail)